FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
MARCH 6, 2025

*Stephens, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
MARCH 6, 2025

SARAH R. PENDLETON
SUPREME COURT CLERK

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| VET VOICE FOUNDATION, THE WASHINGTON BUS, EL CENTRO DE LA RAZA, KAELEENE ESCALANTE MARTINEZ, BETHAN CANTRELL, GABRIEL BERSON, and MARI MATSUMOTO<br><br>         Petitioners/Cross Respondents,<br><br>   v.<br><br>STEVE HOBBS, in his official capacity as Washington State Secretary of State, JULIE WISE, in her official capacity as the Auditor/Director of Elections in King County and a King County Canvassing Board Member, SUSAN SLONECKER, in her official capacity as a King County Canvassing Board Member, and STEPHANIE CIRKOVICH, in her official Capacity as a King County Canvassing Board Member,<br><br>         Respondents/Cross Petitioners. | No. 102569-6<br><br>En Banc<br><br>Filed: <u>March 6, 2025</u> |

GONZÁLEZ, J.—This case concerns some of the most fundamental building

blocks of our representative democracy: the right to vote, the legislature's power

and obligation to ensure that voters can freely exercise that right, and the integrity and security of elections.

In Washington, most voters cast their votes by mail, and each voter must swear under oath that they are eligible to cast that ballot. Before that ballot may be counted, election workers must verify that the signature on the voter's sworn ballot declaration is the signature of the registered voter. If the voter's signature cannot be verified, election workers may challenge that ballot. If the voter does not timely cure their ballot, their vote will not be counted.

All too many ballots are not counted because election workers cannot verify the voter's signatures and the voter does not or cannot cure their ballot in time. The plaintiffs contend that because signature verification results in some lawfully cast ballots not being counted, it facially violates the due process, privileges and immunities, and freedom of elections clauses of our state constitution.

But signature verification is only a part of the election system established by our legislature. In recent years, our legislature has taken substantial steps to improve that system. Among other things, it has directed local election workers to take greater efforts to contact voters whose ballots are challenged and it has expanded the ways voters may cure their ballots and have their votes counted.

We conclude that at least when coupled with the increasingly expansive cure system, signature verification, on its face, does not violate our state constitution.

BACKGROUND

Under our state constitution, "[a]ll Elections shall be free and equal, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." CONST. art. I, § 19. "All persons of the age of eighteen years or over who are citizens of the United States . . . except those disqualified by Article VI, section 3 of this Constitution, shall be entitled to vote at all elections." CONST. art. VI, § 1. "All elections shall be by ballot. The legislature shall provide for such method of voting as will secure to every elector absolute secrecy in preparing and depositing his ballot." CONST. art. VI, § 6. The constitution also requires the legislature to "enact a registration law, and shall require a compliance with such law before any elector shall be allowed to vote." CONST. art. VI, § 7. In addition to its constitutional obligation to enact a registration law, "[t]he legislature is unquestionably authorized by the constitution to provide for the proper conduct of elections." *State ex rel. Kurtz v. Pratt*, 45 Wn.2d 151, 156, 273 P.2d 516 (1954).

The secretary of state is the state's chief elections officer, but, in keeping with Washington's general practice of distributing primary responsibility for many vital services to local governments, county auditors[1] supervise the elections in their

---

[1] In the context of elections in Washington, "'County auditor' means the county auditor in a noncharter county or the officer, irrespective of title, having the overall responsibility to maintain voter registration and to conduct state and local elections in a charter county." RCW 29A.04.025. In King County, that officer is the director of elections. *See* KING COUNTY DEP'T OF ELECTIONS, KING COUNTY CANVASSING BOARD ADMINISTRATIVE RULES 1.3(b) at 1-1.

counties. RCW 29A.04.230, .216. These local county auditors are responsible for mailing each registered voter a ballot, a security envelope to conceal that ballot, a larger return envelope, and instructions. RCW 29A.04.216; RCW 29A.40.091(1). Washington election workers continuously monitor the voting list in several ways to ensure that the list includes only eligible voters. Among other things, election workers remove inactive voters, duplicate registrations, deceased persons, and people registered in other states from the voter rolls.

Voters must establish that they are eligible to vote when they register. RCW 29A.08.010. Most Washington voters vote by mail, though voters do have the option of voting in person at county voting centers starting 18 days before the election. RCW 29A.40.160. Local canvassing boards or their designees are responsible for assuring that the ballot was timely cast and cast by a registered voter eligible to vote on that ballot. RCW 29A.40.110; RCW 29A.60.010.

The ballot materials sent to the voter include a ballot declaration for the voter to sign on the return envelope. RCW 29A.40.091(1). Voters who vote in person have the option of either signing a ballot declaration or providing identification to establish they are eligible to cast that vote. RCW 29A.40.160(10).

Voters who verify their eligibility by signing a ballot declaration must swear, under penalty of perjury, that they are qualified to vote and have not voted in any other jurisdiction in that election. RCW 29A.40.091(2)(a); RCW

29A.40.160(10). If a voter is unable to sign their name, two witnesses may attest instead. WAC 434-230-015(3)(d).

Election workers must be trained on statewide standards and "verify that the voter's signature on the ballot declaration is the same as the signature of that voter in the registration files of the county." RCW 29A.40.110(3). These files automatically include Department of Licensing information such as the signature on an individual's driver's license. Signatures need not be identical for the ballot to be accepted. Variances are "permitted so long as the surname and handwriting are clearly the same." RCW 29A.40.110(3). It requires multiple, significant, and obvious discrepancies to challenge a signature. WAC 434-261-051, -052. In addition, under current rules, workers are instructed to presume "that the signature on the ballot declaration is the voter's signature." WAC 434-261-051(2).

If election officials determine the signature on the ballot declaration matches one of the signatures on file for an eligible and active registered voter, the ballot is marked accepted, the security envelope removed, and the ballot is added to those to be counted. At that point, all identifiable information is disassociated from the ballot and it is placed with other accepted ballots to be counted.

When the person doing the initial signature review has concerns about whether the signatures match, they may make a closer examination or ask a second examiner to review the declaration. If they are still concerned, the ballot may be

5

set aside as "challenged." RCW 29A.60.165. In that case, election officials must contact the voter and give them the opportunity to cure their ballot. RCW 29A.60.165(2). If, prior to 8:00 p.m. on election day, a voter states the signature on the ballot declaration is not their signature, they may be issued a replacement ballot. WAC 434-261-053(6).

A voter whose ballot is rejected may cure their ballot by returning a signature update form.[2] Not all ballots are counted. Between 2016 and 2022, more than 170,000 ballots (out of over 37 million ballots cast) were disqualified through the signature verification process and not cured. In the 2022 general election, about 24,000 ballots were rejected because their signatures did not match.[3]

---

[2] Since this case was filed, new rules allow a voter to cure their ballot by returning a signed form by mail, e-mail, or online or by providing secondary identity verification like the last four digits of their social security number, their driver's license number, or (once implemented) a multifactor authentication code. WAC 434-261-053(5).

[3] After oral argument, Vet Voice moved to supplement the record with data from the 2024 general election. This data suggests the rate of ballots rejected for nonmatching signatures was 0.60 percent, higher than it was in the 2024 primary (0.23 percent) or 2020 general election (0.47 percent). Vet Voice contended the record should be supplemented under RAP 9.11(a), which allows a court to supplement the record on appeal if certain stringent criteria are met. We note that Vets Voice's motion does not address the cure rate. The defendants do not contest the accuracy of Vet Voice's evidence but argue that it is misleading out of context and that the RAP 9.11(a) criteria are not met. We conclude that the evidence is not admissible under RAP 9.11(a) because, among other things, it is not needed to fairly resolve the issues on review or change the decision and deny the motion. *See* RAP 9.11(a)(1), (2). However, courts may take judicial notice of evidence that is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." ER 201(b)(2). Given that Vet Voice drew this

After the 2020 election, the State Auditor's Office conducted a performance audit of ballot rejections in Washington State. The final audit report "found no evidence of bias" in decisions to accept or reject individual ballots. Clerk's Papers (CP) at 532. However, the state auditor was "not able to explain" why ballots cast by young voters were more likely to be disqualified than voters over 40, and ballots cast by Black, Native American, Hispanic, and Asian/Pacific Islander voters were more likely to be rejected than the ballots cast by white voters. *Id.*

The differences were stark. In the 2020 election, for example, 2.68 percent of voters aged 18-21 had their ballots rejected under signature verification while only 0.38 percent of the ballots cast by voters aged 45-65 were rejected. Only 0.63 percent of white voters had their ballots rejected under signature verification, compared to 2.49 percent of Black voters, 1.59 percent of Native American voters, 1.57 percent of Hispanic voters, and 1.24 percent of Asian/Pacific Islander voters. The auditor also found significant differences in the percentage of ballots that were rejected by different counties, from 1.5 percent in Franklin County to 0.04 percent in Columbia County in the 2020 general election.

The auditor "overwhelmingly concurred with counties' decisions about which ballots to accept and which to reject." CP at 564. It identified best practices

___

evidence from the secretary of state's election's records and given that the defendants do not dispute its accuracy, we take judicial notice of the 2024 ballot rejection rate.

for reducing ballot rejections, including the use of experienced employees to review signatures, making multiple efforts to contact voters about challenged ballots, taking active steps to ensure voter signatures are up to date, conducting voter outreach using a variety of media to help ensure voters are aware of the voting processes, ensuring accessible voting locations, contacting voters in their preferred language, proactively obtaining voter's current contact information, clearly informing voters of the purpose of their signatures, intentionally collecting different versions of voter signatures, and using data to implement and track new practices aimed at reducing ballot rejection rates.

Since the performance audit was released and since this case was filed, the legislature has directed election workers adopt some of these best practices. Election workers are now required to contact voters by telephone, e-mail, and text message whenever possible. LAWS OF 2024, ch. 269, § 1 (codified at RCW 29A.60.165). County auditors are also encouraged to contact each registered voter and obtain an updated signature. *Id.* § 2 (codified at RCW 29A.08.646). County auditors are required to develop a community outreach plan to educate voters about signature verification requirements, to do so in any language required by the federal Voting Rights Act of 1965, and to target groups with higher rates of ballot rejection. *Id.* § 5 (codified at RCW 29A.60.168). And as of June 1, 2025, the voter declaration sent by the counties must clearly inform the voter that their signature

on the declaration will be compared to the signature in the voter's registration file. *Id.* § 6 (codified at RCW 29A.40.091). In addition, the legislature has directed the secretary of state to establish an alternative verification options pilot project to allow for the development and testing of methods other than signature verification to verify that a ballot was filled out and returned by the intended voter. LAWS OF 2024, ch. 138, § 1 (codified at RCW 29A.40.111).

FACTS

Vet Voice Foundation, the Washington Bus, El Centro de la Raza, and four individual plaintiffs (Vet Voice) sued Secretary of State Steve Hobbs (the Secretary), King County Director of Elections Julie Wise, and two other members of the King County Canvassing Board (Canvassing Board) in November 2022. All defendants were sued in their official capacities.

Vet Voice argues that because signature verification results in some lawfully cast ballots not being counted it violates article I, sections 3, 12, and 19 of the state constitution. Vet Voice seeks, among other things, an injunction against the use of signature verification in future elections. The Secretary and the Canvassing Board argue that signature verification is a constitutional and integral part of our election system.

All parties moved for summary judgment. The parties submitted evidence about the accuracy of signature verification, the amount of voter fraud in

Washington State, whether signature verification is effective at detecting and preventing voter fraud, and the efficacy of the cure mechanisms, among other things. We will highlight only some of the evidence submitted.

Vet Voice offered a report on signature verification prepared by Dr. Linton Mohammed, an expert in handwriting and signature identification, on the reliability of signature matching as a way to verify a voter's identity. Dr. Mohammed testified that it takes a certified forensic document examiner an hour to verify a simple signature and a minimum of two to four hours to verify a complicated one, rather than the three seconds election workers take for their initial review. He concluded that "signature matching to verify a voter's identity is fundamentally incompatible with election administration and will inevitably result in the mistaken rejection of voters' ballots based on erroneous determinations that ballot signatures are not genuine." CP at 237.

Partially to rebut Dr. Mohammed's report, the Secretary offered a report from forensic document examiner Mark Songer. Songer opined that Dr. Mohammed's comparison of professional forensic document examiners "to election officials acting in their capacity as signature verifiers[] is like comparing apples to oranges." CP at 1759. Songer testified that a forensic document examiner "aids the trier of fact in court cases by testifying as [an] expert witness[] and . . . present[ing] scientific findings in court. Signature verifiers in an election,

10

in contrast, act as part of a system with multiple checks in place to guard against improperly submitted ballots." *Id.* He also opined that Dr. Mohammed had given too little weight to other election safeguards, such as the opportunity to cure. "In their screening capacity, election officials are not charged with performing forensic-level examinations of signatures. Rather, election officials review ballots and determine whether specific legislated conditions have been met to warrant referring a ballot to the curing process." *Id.*

The Canvassing Board submitted a declaration from Brett Bishop, a former forensic document examiner for the Washington State Patrol Crime Laboratory. Bishop also trained election administrators on signature verification for the secretary of state for many years and served on the National Institute of Standards and Technology Expert Working Group on Human Factors in Handwriting Examination and the Pacific Northwest Division of the International Association for Identification. Bishop testified that "lay people can be trained to competently determine whether most signatures on ballot declarations contain the same significant writing characteristics as a known signature and whether there are any fundamental differences between the signature on a ballot declaration and a known signature." CP at 1156. In his opinion, "the signature verification process conducted by trained laypeople as administered in Washington is a workable and reasonable way to determine whether a voter's signature on a ballot declaration is

the same as the signature of that voter in the registration file given the time constraints of election administration." *Id.*

In support of its contention that voting fraud is extraordinarily rare, Vet Voice offered a declaration from Dr. Michael Herron, the William Clinton Story Remsen 1943 Professor of Quantitative Social Science at Dartmouth College in Hanover, New Hampshire. He noted that

> Washington elections have many overlapping safeguards to prevent ineligible voters from voting and unlawful votes from being counted. These safeguards include Washington's voter registration system and its penalties for providing false information in the process of registering to vote; procedures designed to maintain the state's list of registered voters and in particular to remove or cancel the voter registrations of deceased, moved, or other ineligible voters; procedures specifying how submitted mail ballots are handled, which include ballot tracking via barcodes; and, audits that must be conducted prior to election certification.

CP at 264. Based on the number of convictions for voter fraud in Washington, he concluded there were only 40 potential instances of voter fraud in recent years, and none of those instances of fraud involved signatures on mail ballot return envelopes.

The Canvassing Board moved to exclude Dr. Herron's report under ER 702 on the grounds that "[m]easuring the efficacy of the signature verification requirement in preventing voter fraud only by the number of successful voter fraud prosecutions is obviously flawed and unreliable." CP at 1124.

The Secretary offered the expert report of Dr. Robert Stein, the Lena Gohlman Fox Professor of Political Science at Rice University. CP at 1768, 1782. Dr. Stein opined:

(1) In a fully vote-by-mail system, such as Washington's, it is essential to have a means of verifying voter identity and to prevent registered voters from voting more than once to achieve many important democratically aligned goals. Voter signature verification is a reasonable means of accomplishing these goals in a vote-by-mail system and is preferable to other methods of voter identification that are either incompatible with a vote-by-mail system or would otherwise suppress voter turnout.

(2) Washington's particular implementation of signature verification is a reasonable means of effecting the goals of a successful vote-by-mail system.

(3) Even assuming that Washington's implementation of signature verification impacts certain categories of voters, those effects can be corrected at the county level or via statewide changes that do not entirely jettison signature verification as a means of verifying voter identity.

(4) Removal of Washington's signature verification requirement would leave the State without a meaningful mechanism for verifying the validity of cast ballots or to prevent illegitimate votes or systemic manipulation of Washington elections. The substitution of alternative means of voter verification including requiring valid identification at in-person-only elections would harm voters' access to the ballot, decrease voter turnout in the state, decrease ballot completion, and significantly increase the cost of conducting elections.

CP at 1769-70. Dr. Stein also suggested that "[t]he low rates of known voter fraud could just as well indicate that state and federal protections against voter fraud,

including signature verification, are working. Knowing there are safeguards against fraudulent voting, would-be perpetrators of election fraud may be deterred from attempting to steal votes." CP at 1778-79.

Dr. Stein contended that Dr. Herron's focus on confirmed cases of elections fraud undervalued the prophylactic effect of signature verification. He suggested that "there is strong reason to believe the number of rejected matching signatures can be improved with further training of election officials in a limited number of counties and by expanding the mechanisms available for curing ballot challenges." CP at 1801.

The record suggests that 42 criminal charges of voter fraud have been brought in Washington State since 2007. CP at 815 (citing Chris Ingalls, *Criminal Charges for Vote Fraud? That Depends on Where You Live in Washington State*, KING5 (Nov. 23, 2022, 3:49 PM), https://www.king5.com/article/news/investigations/criminal-charges-vote-fraud/281-c800c443-1551-4fb4-94c1-4d1c6f4df53a). For example, Pierce County prosecuted several people for voting improperly in the 2020 election. Most of these people had voted on behalf of a recently deceased spouse or other relative. In contrast, the King County prosecutor declined to prosecute any of the more than 100 people referred to him for suspected voter fraud in 2017, 2020, and 2022.

14

Vet Voice also submitted declarations from many voters who attempted to vote, had their votes rejected due to signature verification, and were unable to cure their ballots. Emblematic were the declarations of plaintiffs Mari Matsumoto and Kaeleene Escalante Martinez, both of whom stated their attempts to cure were rejected.

Director Wise also had her signature challenged. She was able to cure her ballot.

Stuart Holmes, the director of elections for the secretary of state, testified that there are looming threats to the security of elections and that foreign actors have been attempting to hack into states' voting systems since at least 2016. He also testified that "the signature verification process is the keystone in the verification process of processing return ballots. . . . There's no other alternatives that provide the same level of access and security." CP at 372. Holmes also said that "the 2022 Cost of Voting Index ranked Washington second in the nation for voting accessibility," behind only Oregon. CP at 1554 (citing https://costofvotingindex.com). In his view, signature verification was the most accessible method available to voters because it did not require them to appear in person and it did not require them to show identification. He stressed that not all voters have identification and that Washington does not have many polling places where identification could be used to verify eligibility to vote.

15

The trial court denied all parties' summary judgment motions. It adopted the *Anderson-Burdick* framework to determine what level of scrutiny applies in this case. *See Anderson v. Celebrezze*, 460 U.S. 780, 103 S. Ct. 1564, 75 L. Ed. 2d 547 (1983); *Burdick v. Takushi*, 504 U.S. 428, 112 S. Ct. 2059, 119 L. Ed. 2d 245 (1992). Under that framework:

> "A court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments [to the United States Constitution] that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'"

CP at 2919 (quoting *Dudum v. Arntz*, 640 F.3d 1098, 1106 (9th Cir. 2011) (quoting *Anderson*, 460 U.S. at 789)). The court concluded that additional factual development was required before the test could be applied, and reserved ruling on whether signature verification was severable from the rest of the statutory scheme. It also denied the defendants' motion to exclude the expert opinions of Dr. Herron and Dr. Mohammed.

Rather than going to trial under *Anderson-Burdick*, the defendants moved to certify the trial court's order for immediate review, which the plaintiffs did not oppose. *See generally* RAP 2.3(b)(4). The court specifically certified two questions: "(1) what is the appropriate standard of judicial review for Plaintiffs' facial challenges to RCW 29A.40.110(3) under the Washington State Constitution

Article 1, sections 3, 12, and 19?; and (2) whether, under the appropriate standard of judicial review, any party is entitled to summary judgment?" CP at 2982-83.

All parties sought direct discretionary review, which our commissioner granted. The Center for Civil Rights and Critical Justice and Fred T. Korematsu Center for Law and Equality (Centers), the American Civil Liberties Union of Washington and Washington Community Alliance (ACLU), and Scholars of State Constitutions and Election Law (Scholars) filed amici briefs in support of Vet Voice, and the Brennan Center for Justice filed an amicus brief that was not in support of either party.

ANALYSIS

We review both the constitutionality of a statute and summary judgment de novo. *Hale v. Wellpinit Sch. Dist. No. 49*, 165 Wn.2d 494, 503, 198 P.3d 1021 (2009) (citing *State v. Jones*, 159 Wn.2d 231, 237, 149 P.3d 636 (2006); *Weyerhaeuser Co. v. Com. Union Ins. Co.*, 142 Wn.2d 654, 665, 15 P.3d 115 (2000)). Statutes are presumed constitutional, and in most cases the challenger bears the burden of establishing otherwise. *State v. Villela*, 194 Wn.2d 451, 456, 450 P.3d 170 (2019) (quoting and citing *State v. Lanciloti*, 165 Wn.2d 661, 667, 201 P.3d 323 (2009)).

Vet Voice brings only facial constitutional challenges. "[T]he court's focus when addressing constitutional facial challenges is on whether the statute's

language violates the constitution, not whether the statute would be

unconstitutional 'as applied' to the facts of a particular case." *Tunstall v.*

*Bergeson*, 141 Wn.2d 201, 220-21, 5 P.3d 691 (2000) (citing *JJR Inc. v. City of*

*Seattle,* 126 Wn.2d 1, 3-4, 891 P.2d 720 (1995)). "Facial claims are generally

disfavored." *Woods v. Seattle's Union Gospel Mission*, 197 Wn.2d 231, 240, 481

P.3d 1060 (2021) (citing *State v. McCuistion*, 174 Wn.2d 369, 389, 275 P.3d 1092

(2012)).[4]

A. STANDARD OF REVIEW

Vet Voice contends that strict scrutiny properly applies. The State argues

for a lesser standard of review. As we have concluded signature verification

survives any level of scrutiny, we assume without deciding that strict scrutiny

applies.

We note that for more than a century, this court has carefully scrutinized

statutes that exclude a category of otherwise-eligible voters and effectively applied

strict scrutiny, even before the term was coined. *See Malim v. Benthien*, 114 Wash.

---

[4] The State contends that since this is a facial constitutional challenge, Vet Voice must show that there is no set of circumstances under which the statute can be applied. This standard has been frequently articulated by this and other courts. *See Portugal v. Franklin County*, 1 Wn.3d 629, 647, 530 P.3d 994 (2023) (quoting *Woods,* 197 Wn.2d at 240). We stress that "'[t]he proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant.'" *City of Los Angeles v. Patel*, 576 U.S. 409, 418, 135 S. Ct. 2443, 192 L. Ed. 2d 435 (2015) (quoting *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 894, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992)). A statute does not survive facial constitutional scrutiny merely because it has no effect on some group of people or under some circumstances.

533, 196 P. 7 (1921); *see also City of Seattle v. State*, 103 Wn.2d 663, 670, 672, 694 P.2d 641 (1985) (citing *Hill v. Stone,* 421 U.S. 289, 297-98, 95 S. Ct. 1637, 44 L. Ed. 2d 172 (1975)). To survive strict scrutiny, the State must generally show a statute is narrowly tailored to serve a compelling state interest and that it has used the least restrictive means to further that interest. *Collier v. City of Tacoma*, 121 Wn.2d 737, 753, 854 P.2d 1046 (1993); *Burson v. Freeman*, 504 U.S. 191, 199, 112 S. Ct. 1846, 119 L. Ed. 2d 5 (1992) (plurality opinion).

We caution, however, that strict scrutiny is not the appropriate standard of review for all constitutional challenges to statutes that touch on elections. Our constitution charges the legislature with the obligation to enact legislation to enable elections, and it is entitled to significant deference. *See* CONST. art. VI, § 6; *see, e.g.*, *Portugal v. Franklin County*, 1 Wn.3d 629, 658, 530 P.3d 994 (2023) (applying rational basis review to a challenge to elections statutes). As this court observed long ago:

> The provision[] of § 19, Article I . . . that all elections shall be free and equal . . . does not mean that voters may go to the polls at any time and vote on any question they see fit, but only at the stated times provided by the statutes relating to elections. Neither does it mean that voters, in the free exercise of the right of suffrage, may vote as many times upon any one question or candidacy as they see fit; although a literal construction of the language of § 19 might lead to that. It does not mean that elections and voters may not be regulated and properly controlled.

*State v. Wilson*, 137 Wash. 125, 132-33, 241 P. 970 (1925). Effectively, we have applied rational basis review to those statutes that effectuate the right to vote and structure how that right shall be exercised. *See State ex rel. Shepard v. Superior Ct.*, 60 Wash. 370, 374, 111 P. 233 (1910). Under this standard, we presume statutes are constitutional and the burden is on the challenger to show otherwise. *Seeley v. State*, 132 Wn.2d 776, 795, 940 P.2d 604 (1997) (citing *State v. Shawn P.*, 122 Wn.2d 553, 561, 859 P.2d 1220 (1993)). "The rational basis test requires only that the means employed by the statute be rationally related to legitimate state goals, and not that the means be the best way of achieving that goal." *Id.*; *accord Am. Legion Post No. 149 v. Dep't of Health*, 164 Wn.2d 570, 604, 192 P.3d 306 (2008).

This dichotomy is present in other states. As the Massachusetts Supreme Judicial Court summarized:

> Because the right to vote is a fundamental one protected by the Massachusetts Constitution, a statute that significantly interferes with that right is subject to strict judicial scrutiny. By contrast, statutes that do not significantly interfere with the right to vote but merely regulate and affect the exercise of that right to a lesser degree are subject to rational basis review to assure their reasonableness.

*Chelsea Collaborative, Inc. v. Sec'y of Commonwealth*, 480 Mass. 27, 33, 100 N.E.3d 326 (2018) (citations omitted); *see also Weinschenk v. State*, 203 S.W.3d

201, 216 n.26 (Mo. 2006)*; Shumway v. Worthey*, 2001 WY 130, ¶9, 37 P.3d 361, 366.

Federal courts have distilled an analytical framework for voting rights cases from two federal cases, *Burdick*, 504 U.S. at 433, and *Anderson*, 460 U.S. 780. *See Dudum*, 640 F.3d at 1106.  The *Anderson-Burdick* approach rejects both rational basis and strict scrutiny.  Instead, the judge is essentially instructed to weigh the burden on the right to vote against the State's interest.  *Anderson*, 460 U.S. at 789-90.

*Anderson-Burdick* has come under criticism for being "nebulous and unclear, resulting in vague decisions that fail to distinguish between constitutional and unconstitutional state election regulations."  Joshua A. Douglas, Note, *A Vote for Clarity: Updating the Supreme Court's Severe Burden Test for State Election Regulations That Adversely Impact an Individual's Right to Vote*, 75 GEO. WASH. L. REV. 372, 373 (2007))*; see also Mont. Democratic Party v. Jacobsen*, 2024 MT 66, ¶¶ 14-15, 416 Mont. 44, 545 P.3d 1074. We note that the amici have all argued for a different formulation of what triggers heightened scrutiny and how that heightened scrutiny should be applied.  Given the uncertainty of the *Anderson-Burdick* framework, we decline to adopt it at this time.

We conclude that laws that are alleged to burden the right to vote must be carefully examined to determine what level of scrutiny is appropriate. If a law

imposes a heavy burden on the right, it is properly subject to strict scrutiny. If the law imposes a lesser burden, a lesser degree of scrutiny is required. However, since we conclude that this particular signature verification statute survives any level of scrutiny, we need not decide which level of scrutiny is constitutionally required.

B. FREEDOM OF ELECTIONS CLAUSE

Under our state constitution, "[a]ll Elections shall be free and equal, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." CONST. art. I, § 19.

To survive strict scrutiny, the "government must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Collier*, 121 Wn.2d at 749. However, even when applying strict scrutiny, the United States Supreme Court has never required a state to *empirically* demonstrate that an election law accomplishes its compelling purpose as Vet Voice essentially argues here. *Burson*, 504 U.S. at 199, 208-09 ("because a government has such a compelling interest in securing the right to vote freely and effectively, this Court never has held a State 'to the burden of demonstrating empirically the objective effects on political stability that [are] produced' by the voting regulation in question" (alteration in original) (quoting *Munro v. Socialist Workers Party*, 479 U.S. 189, 195, 107 S. Ct. 533, 93 L. Ed. 2d 499 (1986))).

In *Burson*, for example, the court applied strict scrutiny and upheld a law that prohibited campaigning within 100 feet of the entrance to a polling place. *Id.* at 208-09. The court did not require the state to prove that 100 feet was the minimum boundary that could accomplish the constitutionally compelling purpose of preventing voter intimidation or election fraud. *Id.* at 209. Essentially, the court relied on history and logic to determine that the limitation was constitutional. *Id.* at 200-09.

Similarly, *Munro* concerned a now repealed Washington law that required third party candidates to receive at least one percent of the primary vote before they could appear on the general election ballot as their party's nominee. *Munro*, 479 U.S. at 191-92 (citing former RCW 29.18.110 (1985)). A candidate who received less than that threshold challenged the statute as violating the First and Fourteenth Amendments. *Id.* at 191. The United States Supreme Court upheld that statute as well. *Id.* It concluded the State had a compelling interest in preserving the integrity of the electoral process and that limiting the number of candidates on the general election ballot to those that had demonstrated a modicum of voter support served that interest. *Id.* at 196. No evidentiary showing was required.

In response to the argument that the State had not shown that requiring a one percent threshold narrowly served that interest, the Court held:

> To require States to prove actual voter confusion, ballot overcrowding, or the presence of frivolous candidacies as a predicate to the imposition of reasonable ballot access restrictions would invariably lead to endless court battles over the sufficiency of the "evidence" marshaled by a State to prove the predicate. Such a requirement would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action. Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights.

*Id.* at 195-96.

Vet Voice does not dispute that the State has a compelling interest in protecting the integrity of the voting system and individual voting rights, and in upholding public confidence. It disputes whether that signature verification is narrowly tailored to serve these interests.

First, Vet Voice argues that the defendants have failed to offer meaningful evidence that signature verification is narrowly tailored to protect integrity and security of the voting system. It discounts the defendants' evidence as anecdotal and self serving. It stresses that the defendants admitted they had done no studies to determine whether signature verification actually improves election security or prevents fraud.

But the United States Supreme Court has rejected this approach under the federal constitution in *Munro* and *Burson*. *See Munro*, 479 U.S. at 195-96. We have been given no reason to adopt this approach under our state constitution. We

24

note that the defendants offered sworn declarations from election officials that signature verification does prevent many invalid ballots from being counted. Given these election officials' experience, we find this evidence probative.

Vet Voice also suggests that low levels of voter fraud detected in recent elections in Vermont and Pennsylvania demonstrate that signature verification is not narrowly tailored to serve the State's compelling interests. Vermont, apparently, does not use robust signature verification. Vet Voice cites the fact that Vermont election officials referred only seven cases of potential voter fraud (out of 370,968 votes cast) to prosecutors after the 2020 general election as evidence that signature verification is not necessary. But given the record before us, we find little reason to think the number of prosecutions are indictive of whether signature verification detects or deters election fraud. Prosecutors have discretion whether to charge and may well have other priorities.

Vet Voice also calls our attention to a footnote in the Pennsylvania Supreme Court opinion noting the lack of evidence that mail-in voting was not secure. *McLinko v. Dep't of State*, 279 A.3d 539, 575 n.44 (Pa. 2022). This footnote noting a lack of evidence is hardly a rigorous analysis of whether signature verification is required for a secure election. The opinion mentions that voter signatures appear on the outside of the ballot and are available to be matched. *Id.* at 575. But it does not discuss the security measures in any depth.

The Secretary and the Canvassing Board argue that without signature verification, the State will need to choose between leaving elections system open to attack or adopting more burdensome security. Director Wise testified that without signature verification, there is no mechanism to verify that the ballot was cast by the registered voter. She offered supporting declarations from several other election administrators.

The Secretary notes that other states have adopted systems where voters include a copy of their identification or write their driver's license number on the outside of the ballot envelope. The Secretary's expert noted that these methods have significant drawbacks in that not every voter has identification and many others will be reasonably concerned about identity theft.

The Secretary's expert, Dr. Robert Stein, conceded that votes could be validated biometrically, such as with fingerprints. But, he noted, many voters do not have fingerprints on file and may reasonably be concerned with sharing their fingerprints with the government. He warned against requiring such measures, concluding that "[m]arginalized communities, who may have negative associations with and feelings toward law enforcement due at least in part to histories of over policing and systematic bias in the criminal justice system, may be especially suspicious of any attempt to gather fingerprints that are used so often in criminal

26

investigations." CP at 1788. This evidence suggests signature verification is narrowly tailored to accomplish security without losing accessibility.

Signature verification has deep history in Washington and widespread use around the country. *See* LAWS OF 1921, ch. 143 §§ 3-4; CAL. ELEC. CODE § 3019(a)(1); COLO. REV. STAT. § 1-7.5-107.3(1)(a); HAW. REV. STAT. § 11-106; NEV. REV. STAT. § 293.269927; OR. REV. STAT. § 254.470(11); UTAH CODE ANN. § 20A-3a-401. No decision drawn to our attention has required states to gather empirical evidence before taking steps to secure their elections. The other security measures raised in this record all have significant drawbacks. Signature verification, as part of a robust system of checks, provides both security and ease of voting. The defendants have submitted considerable evidence that signature verification is narrowly tailored to protect the integrity and security of elections. Vet Voice's evidence to the contrary is predicated on reports that either used convictions as the only measure of voter fraud or did not consider the availability of cure provisions.

We conclude that the defendants have shown that signature verification is narrowly tailored and designed to promote the compelling purposes of election security and integrity. We hold that on its face, Washington's signature verification law does not violate the freedom of elections clause of our state constitution, article I, section 19.

C. PRIVILEGES AND IMMUNITIES

Under our state constitution's privileges and immunities clause, "[n]o law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations." CONST. art. I, § 12. "'For a violation of article I, section 12 to occur, the law . . . must confer a privilege to a class of citizens.'" *Portugal*, 1 Wn.3d at 657 (alteration in original) (internal quotation marks omitted) (quoting *Madison v. State*, 161 Wn.2d 85, 95, 163 P.3d 757 (2007) (plurality opinion)). A statute that implicates the privileges and immunities clause must not favor one class of citizens over another without reasonable grounds. *Martinez-Cuevas v. DeRuyter Bros. Dairy*, 196 Wn.2d 506, 514, 523, 475 P.3d 164 (2020).

The right to vote is a privilege for purposes of article I, section 12 of the state constitution. *Madison*, 161 Wn.2d at 95. Vet Voice argues that signature verification violates article I, section 12 because it inherently favors voters with consistent penmanship who sign their name in a way that is verifiable to an election worker.[5]

---

[5] Vet Voice confirmed at oral argument that it is not arguing that the legislature made consistent penmanship an additional qualification of the right to vote. Wash. Sup. Ct. oral arg., *Vet Voice Found. v. Hobbs*, No. 102569-6 (Oct. 31, 2024), at 13 min., 57 sec., *video recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org/video/washington-state-supreme-court-2024101151/?eventID=2024101151.

But this is a facial challenge and nothing on the face of RCW 29A.40.110(3), especially when read in context of the cure provisions, favors those with consistent penmanship. Vet Voice may well have a viable as-applied article I, section 12 claim. *See Portugal*, 1 Wn.3d at 657 (rejecting facial article I, section challenge to Washington's Voting Rights Act but recognizing there might be a future as-applied challenge). However, on its face, subsection .110(3) does not inherently favor any class of voters.

D. DUE PROCESS

Under our constitution, "[n]o person shall be deprived of life, liberty, or property, without due process of law." CONST. art. I, § 3. "Our state due process protection against 'the arbitrary exercise of the powers of government' has both procedural and substantive components." *Chong Yim v. City of Seattle*, 194 Wn.2d 682, 688, 451 P.3d 694 (2019) (quoting *State v. Cater's Motor Freight Sys., Inc.*, 27 Wn.2d 661, 667, 179 P.2d 496 (1947)). This case implicates the substantive component of the due process clause, which "'protects against arbitrary and capricious government action even when the decision to take action is pursuant to constitutionally adequate procedures." *Id.* at 688-89 (quoting *Amunrud v. Bd. of Appeals*, 158 Wn.2d 208, 218-19, 143 P.3d 571 (2006)).

On its face, RCW 29A.40.110(3) does not interfere with the enjoyment of a right. While the right to vote is fundamental, there is no constitutional right to a

particular method of voting. *See Burdick*, 504 U.S. at 433. "When state action does not affect a fundamental right, the proper standard of review is rational basis," which requires only that "the challenged law must be rationally related to a legitimate state interest." *Amunrud*, 158 Wn.2d at 222.

Vet Voice argues that signature verification is arbitrary and capricious, and unfairly values some voters in some counties over others. But, as with its other constitutional claims, it chose to bring this as a facial challenge, and, on its face, RCW 29A.40.110(3) does not value voters in some counties over others and is not arbitrary and capricious. Relevantly, it directs election workers to "verify that the voter's signature on the ballot declaration is the same as the signature of that voter in the registration files of the county." RCW 29A.40.110(3). While differences in the rates of disqualifications in different counties or for different demographics might raise an as-applied challenge, on its face, the statute is not arbitrary.

We hold that RCW 29A.40.110(3) does not facially violate article I, section 3 of the state constitution.

Given our resolution, we do not reach whether the trial court properly admitted Dr. Herron's report or whether RCW 29A.40.110(3) is severable from the rest of our election statutes.

CONCLUSION

The right to vote is fundamental. The undisputed fact that signature verification results in tens of thousands of votes being disqualified every election raises significant constitutional concerns.  Nothing in this opinion should be read to foreclose an as-applied challenge to the way signature verification has been used in specific instances or places.

But RCW 29A.40.110(3), on its face, does not require election workers to disqualify a single valid ballot.  When coupled with the increasingly expansive opportunities to cure a rejected ballot, subsection .110(3) does not exclude anyone from casting a vote or make the vote "so inconvenient that it is impossible to exercise it."  *Shepard*, 60 Wash. at 372.

We hold that the defendants are entitled to summary judgment. Accordingly, we reverse in part, affirm in part, and remand for entry of summary judgment in favor of the defendants.

González, J.

WE CONCUR:

Stephens, C.J.

Yu, J.

Johnson, J.

Montoya-Lewis, J.

Madsen, J.

Whitener, J.

Gordon McCloud, J.

Sutton, J.P.T.