His Excellency Bishop Ricardo
SURINACH, etc., et. al.,
Plaintiffs, Appellants,

v.

Carmen T. PESQUERA de BUSQUETS,
Defendant, Appellee.

No. 78–1527.

United States Court of Appeals,
First Circuit.

Argued April 2, 1979.

Decided July 25, 1979.

Jose Guillermo Vivas, Ponce, P. R., with whom Carlos Martinez-Texidor, and Vivas & Martinez-Texidor, Ponce, P. R., were on brief for appellants.

Reina Colon De Rodriguez, Asst. Sol. Gen., San Juan, P. R., with whom Hector A. Colon Cruz, Sol. Gen., San Juan, P. R., was on brief for appellee.

George E. Reed, Gen. Counsel, and Patrick F. Geary, Asst. Gen. Counsel, Washington, D. C., on brief for United States Catholic Conference, amicus curiae.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

This litigation was instituted by the President of the Inter-Diocesan Secretariat for Catholic Education of Puerto Rico and superintendents of Roman Catholic schools in a number of Puerto Rican dioceses to have declared unconstitutional actions taken by the Secretary of Consumer Affairs of Puerto Rico to investigate the operating costs of Roman Catholic schools in the Commonwealth. Plaintiffs also sought to have the Secretary permanently enjoined from "interfering, meddling, or entangling with or in the financial affairs of the Roman Catholic Apostolic Church."

In April of 1973 the Commonwealth of Puerto Rico established a Department of Consumer Affairs "to defend and imple-

ment the rights of the consumer, to restrain inflationary trends; as well as the establishment and inspection of a price control over the goods and services for use and consumption." Law Number 5 of April 23, 1973, as amended, Article 3, § 341b. The powers accorded the Secretary of the Department for the fulfillment of his duties are wide ranging; he may issue subpoenas to compel the appearance of witnesses and the production of documents and information, Article 6(h), inspect records, documents and physical facilities of entities subject to his regulation, Article 6(w), and resort to the courts to ensure compliance with his directives, Article 6(i). His scope of inquiry is equally untrammeled, for "[t]he Department is . . . empowered to carry out all kinds of studies and investigations on matters affecting the consumer, and to such purposes the Secretary may require the information which might be necessary, pertinent and essential to achieve such purposes." Article 14(a), (b), (c).

Pursuant to this mandate, the Department launched an investigation of the costs of private schools operating in Puerto Rico, an investigation which encompassed parochial schools under the aegis of the Roman Catholic Church. In July of 1978, plaintiffs were ordered by the Secretary to provide within ten days specified documents and books and to furnish such information as the school's annual budgets for the three previous years; the source of their finances (registrations, donations, governmental and others); costs of transportation; the student cost per academic grade for registration, admission dues, activities, medical insurance, nourishment services, materials and school uniforms; the salaries paid to teachers, administrative, maintenance and other personnel; book costs and invoices per grade and their resale prices as well as the names and addresses of book suppliers; and scholarships and the criteria upon which they were awarded. The plaintiffs refused compliance with the order and brought the instant suit, alleging that the Secretary's actions were in violation of the Religion Clauses of the First Amendment and constituted an impermissible entanglement of the affairs of church and state.

On the motion of the defendant, the district court dismissed the complaint.[1] The court recognized that it was faced with the " 'sensitive and delicate task' of balancing governmental dictates of social policy against a religious claim for exemption from requirements of general applicability", but concluded that "the general investigation to which [the Catholic schools] are being subject does not penalize, hinder or otherwise curtail any religious practice of Plaintiffs." It further found that the amount of entanglement which this administrative scheme would engender, at least in the preliminary information gathering stages of the investigation, fell short of a constitutional transgression.[2] Because we find that the First Amendment indeed is

1. Although the district court's mandate merely states that the complaint is dismissed, it is clear that it reached and fully adjudicated the merits of this dispute. The defendants had moved to dismiss or for summary judgment, and the court expressly stated that "[n]o factual disputes are extant, and the matter is now ripe for disposition." The merits of the case and not merely the sufficiency of the complaint thus are properly before us for resolution.

2. Subsequent to the district court's decision in this case, it had occasion to review another challenge to the Department of Consumer Affairs' request for documents and information pursuant to its investigation of the costs of private education in Puerto Rico. That suit was brought by eighteen private, nonsectarian schools in Puerto Rico and their professional

organization and alleged that the investigation constituted an unconstitutional deprivation of their right to conduct their affairs and the liberty of parents to select and direct the education of their children. Taking an approach similar to that followed in the instant case, the court held that there was no concrete controversy concerning the possibility of actual cost regulation and that no privacy rights were infringed by the compelled disclosure. *Colegio Puertorriqueno de Ninas, etc. v. Pesquera de Busquest*, 464 F.Supp. 761 (D.P.R.1979).

We wish to make clear that the validity of the Department's investigation into the costs of private education as applied to nonsectarian schools is not before us, and we express no opinion in that regard.

encroached upon by the Commonwealth's efforts to obtain the above information from the schools and that the Commonwealth has failed to shoulder its substantial burden of justifying that encroachment, we reverse the judgment below.

Our analysis of the issues presented by this case parts company with that of the district court from the outset. The court below placed great emphasis on the "preliminary nature of the administrative action challenged in this case":

> "The record in this case is devoid of any substantial indicia of a realizable regulation of the internal financial affairs of the Catholic Schools. Furthermore, the Defendant has not palpably limited the tuition costs of the schools. We therefore are in no position to decide the validity of an actual governmental regulation in these areas. We simply hold that the *status quo* fails to support a cause of action under the religious clauses of the First Amendment."

While it is true that the constitutionality of the entire regulatory scheme as applied to Catholic schools is not squarely before us, the court's bifurcation of the gathering of the information and the purpose for which it is sought strikes us as both artificial and constitutionally unsound. The Department

of Consumer Affairs is empowered to "restrain inflationary trends" by "establish[ing]" and "inspect[ing]" a system of price control for goods and services in the Puerto Rican economy. And as counsel for the Secretary made clear at oral argument, the information in this case is sought pursuant to that broad directive. The gathering of information is not viewed as an end in itself. To the contrary, it is merely a first step by the Department; the records and information furnished by the schools will be examined and may be made public; both public hearings and the enactment of regulations may then take place, and if the Department ultimately determines that the costs of Catholic schools must be contained, ceilings can and will be imposed.[3] At least in this case we are dealing with the gathering of information in a context where we cannot conceive—nor have we been apprised—of any rational end product use of this information which will not encroach on appellants' First Amendment rights.

 It is not the obligation of the schools to prove as a precondition for relief at this time that this precise scenario, which hardly can be called speculative, in fact will unfold.[4] To the contrary, in the sensitive area of First Amendment religious freedoms, the burden is upon the state to show that imple-

---

**3.** Appellee relies on several Supreme Court cases which, it is argued, stand for the proposition that requiring information about an activity can in no sense be considered regulation of that activity, and from there concludes that requests for information always must be viewed in isolation from the purpose to which that information may be put. That reliance and the conclusion drawn therefrom is misplaced. In *United States v. Five Gambling Devices*, 346 U.S. 441, 74 S.Ct. 190, 98 L.Ed. 179 (1953), the Court stated that "here there is no attempt to regulate [local activities]; all that is required is information in aid of enforcement of *the conceded power* to ban interstate transportation." (Emphasis added.) And in *Interstate Commerce Commission v. Goodrich Transit Co.*, 224 U.S. 194, 211, 32 S.Ct. 436, 439–40, 56 L.Ed. 729 (1912), the Court found that:

> "The object of requiring [business] accounts to be kept in a uniform way, and to be open to the inspection of the Commission is not to enable it to regulate the affairs of the corporations not within its jurisdiction, but to be informed concerning the business methods of

the corporations *subject to the act, that it may properly regulate such matters as are really within its jurisdiction.*" (Emphasis added.)

Thus, in these cases, the information was sought pursuant to a regulatory power, the validity of which was not in dispute. The Court did not divorce the gathering of information from the regulatory purpose for which it was sought. To the contrary, while the distinction was recognized, the former was analyzed in terms of the latter. Cf. *Marchetti v. United States*, 390 U.S. 39, 47, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968) ("Information obtained as a consequence of the federal wagering tax laws is readily available to assist the efforts of state and federal authorities to enforce these penalties.")

**4.** We merely note appellees' description of the costs in private schools as an "inflationary spiral", as at least suggesting what is the current perception of the Department—that the rate at which those costs are rising must be contained.

mentation of a regulatory scheme will *not* ultimately infringe upon and entangle it in the affairs of a religion to an extent which the Constitution will not countenance. In cases of this nature, a court will often be called upon to act in a predictive posture; it may not step aside and await a course of events which promises to raise serious constitutional problems. In *Catholic Bishop of Chicago v. NLRB*, 559 F.2d 1112 (7th Cir. 1977), *aff'd on statutory grounds*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), the court of appeals held that the exercise of jurisdiction by the NLRB over schools operated by the Roman Catholic Church violated the separation between church and state.[5] Reasoning from the cases which have found various forms of aid to sectarian schools to be unconstitutional, it expressly rejected the Board's contention that any constitutional problems should be litigated "down the line" if and when disputes arose between the Board and schools subject to its jurisdiction:

"The whole tenor of the Religion Clauses cases involving state aid to schools is that there does not have to be an actual trial run to determine whether the aid can be segregated, received and retained as to secular activities only, but it is sufficient to strike the aid down that a reasonable likelihood or possibility of entanglement exists." 559 F.2d at 1126.

*See Lemon v. Kurtzman*, 403 U.S. 602, 621, 91 S.Ct. 2105, 2115, 29 L.Ed.2d 745 (1971) ("The government cash grants before us now provide no basis for predicting that comprehensive measures of surveillance and controls will not follow."); *Walz v. Tax Commission*, 397 U.S. 667, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970) ("Elimination of the exemption would tend to expand the involvement of government by giving rise to tax valuation of church property, tax liens, tax foreclosures, and the direct con-

frontations and conflicts that follow in the train of those legal processes."). Accordingly we believe that the constitutional perils of the compelled disclosure of cost information must be assessed and the Commonwealth's interest in that disclosure justified in view of the purpose for which the information was solicited.

■ The schools in question are an integral part of the Catholic Church and as such "involve substantial religious activity and purpose." *Lemon v. Kurtzman, supra*, 403 U.S. at 616, 91 S.Ct. at 2113. Cognizant of the fact that the course of neutrality charted by the Constitution toward religion cannot follow "an absolutely straight line", *Walz v. Tax Commission, supra*, 397 U.S. at 669, 90 S.Ct. 1409; *see Lemon v. Kurtzman, supra*, 403 U.S. at 614, 91 S.Ct. 2105; *Zorach v. Clauson*, 343 U.S. 306, 312–13, 72 S.Ct. 679, 96 L.Ed. 954 (1952), our task here is to determine whether the "particular acts in question are intended to establish or interfere with religious beliefs and practices or have the effect of doing so." *Walz v. Tax Commission, supra*, 397 U.S. at 669, 90 S.Ct. at 1412; *see Sherbert v. Verner*, 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), *citing Braunfeld v. Brown*, 366 U.S. 599, 607, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). The court below concluded that because the Secretary's investigation was directed at *all* private schools in Puerto Rico rather than merely those of the Roman Catholic Church and because the information solicited did not probe into doctrinal matters, there had been no showing that either the purpose or the effect of the Commonwealth's actions was to burden the free exercise of religion. While we agree that there has been no showing of any purpose to inhibit religion, the effect of the Commonwealth's actions, even though aimed at private schools in general, constitutes a palpable threat of

5. The Supreme Court concluded that "Congress did not contemplate that the Board would require church-operated schools to grant recognition to unions as bargaining agents for their teachers", *NLRB v. The Catholic Bishop of Chicago et al.*, —— U.S. ——, ——, 99 S.Ct. 1313, 1322, 59 L.Ed.2d 533 (1979), and therefore did not rule on the constitutionality of the exercise

of the Board's jurisdiction. It did however refer to what it called "difficult and sensitive questions arising out of the guarantees of the First Amendment Religion Clauses" and state that "the record affords abundant evidence that the Board's exercise of jurisdiction over teachers in church-operated schools would implicate the guarantees of the Religion Clauses." *Id.*

state interference with the internal policies and beliefs of these church related schools. *See Serbian Eastern Orthodox Diocese for the United States of America and Canada v. Milivojevich*, 426 U.S. 696, 713, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). As the Supreme Court repeatedly has recognized, "[a] regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion." *Wisconsin v. Yoder*, 406 U.S. 205, 220, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

The Canon Law of the Roman Catholic Church pertaining to Catholic Schools states that the Bishops, in fulfillment of their duty to ensure that Catholic children attend Catholic schools, must see that "their own schools [are] not inferior to public ones; therefore it follows, that maximum diligence should be devoted to establish them where there are none and improve them where they are below the public schools' standards." 57 Concern of the Bishops (Canon 1379–1380). The Episcopal Conference of Puerto Rico, in its Pastoral Letter: Education in Catholic Schools in Puerto Rico, further emphasizes that "[t]here are two characteristics of the Catholic school that should always prevail: academic excellency and genuine Catholicism." These goals must be pursued vigorously:

"In a constantly changing and competitive world, the alumni of our Catholic schools will not only need a basic general culture, but also an academic formation well rooted, starting with the lower grades. Therefore, our Directors and Principals should have, not only an exceptionally qualified teaching personnel, but whenever possible, all the equipment and methods that the new techniques and the modern psychological and educational sciences offer.

"We owe this academic excellency to all the parents of our students and to the students themselves, in the degree that each school is capable of offering."

We think it clear that the eventual use to which the school's cost information could be put could interfere seriously with these religious duties and objectives. The Department, sifting through the details of the schools' budgets and holding its hearings, may conclude that costs are rising too fast and must be contained to a specified level. While such a determination might be consistent with the Department's mandate, it surely could clash with what is a religious belief and practice of those who administer these schools, namely that the highest quality education possible must be provided to their students. We do not suggest that quality of education and the expenditure of money invariably are linked, but it would be unrealistic to assume that the curricula and facilities of these schools would not be curtailed and hence religious objectives affected if they were forced to contain their costs. *Cf. Buckley v. Valeo*, 424 U.S. 1, 19, 96 S.Ct. 612, 634, 46 L.Ed.2d 659 (1976) ("A restriction on the amount of money a person or group can spend on political communication during the campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached.").

Moreover, it seems likely that as the regulatory process unfolds, some determination of which costs are "necessary" and "reasonable" in the running of a private school would have to be made. For example, the Department perhaps could determine that the ratio of teachers to students in these schools is unusually low, and that the rising costs of education could be stemmed by adjusting that ratio. The Bishop and superintendents of these schools, on the other hand, may have decided that small classes of students are vitally important if there is to be the sustained and intensely personal contact between a pupil and his religious mentor that they deem necessary to the mission of the Catholic Church and its schools. *See Lemon v. Kurtzman, supra*, 403 U.S. at 618, 91 S.Ct. 2105. In short, the value judgments and sense of priorities of the regulator and regulatee are likely to be grounded in wholly different concerns. And whether the schools were to be ordered specifically to increase the teacher-student ratio as a means of cost containment, or

whether that factor merely would figure in the Department's conclusion and order that costs in general must be contained, a wholly secular objective would be furthered at the expense of one which is religious. We find it scant comfort that no such judgments have yet been brought to bear by the Department, or that the Department might ultimately conclude that the costs of these schools need not be contained by government controls. The appellants' ability to make decisions concerning the recruitment, allocation and expenditure of their funds is intimately bound up in their mission of religious education and thus is protected by the free exercise clause of the First Amendment. The Department's attempt to take its first steps down its regulatory road by gathering information accordingly are suspect, both in light of the purpose for which the information is sought and in itself, for as has long been recognized, "compelled disclosure has the potential for substantially infringing the exercise of First Amendment rights." *Buckley v. Valeo, supra,* 424 U.S. at 66, 96 S.Ct. at 657. We see that potential in the chilling of the decision making process, occasioned by the threat that those decisions will become the subject of public hearings and that eventually, if found wanting, will be supplanted by governmental control. *See Catholic Bishop of Chicago v. NLRB, supra,* 559 F.2d at 1124. And even if that governmental control should not come to pass, disclosure of the schools' finances—from amounts of donations to details of expenditures—could provide private groups or the press with the tools for accomplishing much the same ends.

Furthermore, the Secretary's power to "regulate, fix, control, freeze and review", § 341e(a), the schools' prices is "a continuing [involvement] calling for official and continuing surveillance leading to an impermissible degree of entanglement." *Walz v. Tax Commission, supra,* 397 U.S. at 675, 90 S.Ct. at 1414. Such an entanglement between the affairs of church and state is "an independent evil against which the Religion Clauses were intended to protect." *Lemon v. Kurtzman, supra,* 403 U.S. at 624–25, 91 S.Ct. at 2117. The subpoenas which gener-

ated this controversy sought extremely detailed information about the expenditure of funds of these Catholic schools. If the schools are forced to comply, that information will be subjected to governmental perusal, to public examination, and ultimately may form the basis for significant governmental involvement in their fiscal management. Even if we were able to countenance the degree of entanglement occasioned by the government's involvement in these details of fiscal administration, we could not feel confident that an end to that involvement was in sight. To the contrary, with ceilings in place, the Commonwealth would have the ongoing powers necessary to ensure compliance with its orders and regulations, from compelling the keeping of records and the providing of testimony to the continuing inspection of papers and physical facilities. Sections 341e(u), (w). This governmental program thus has the "self-perpetuating and self-expanding propensities" which have alerted courts to an increased danger of an unconstitutional degree of entanglement. *See Lemon v. Kurtzman, supra,* 403 U.S. at 624, 91 S.Ct. 2105.

It is true, as the district court emphasized, that the Supreme Court has been especially sensitive to an entanglement which requires the state to distinguish between and thus determine what is religious and what is secular. For example, in *Lemon v. Kurtzman, supra,* the Court struck down two systems of state aid to parochial schools, on Establishment Clause and entanglement grounds:

"[T]he program requires the government to examine the school's records in order to determine how much of the total expenditures is attributable to secular education and how much to religious activity. This kind of state inspection and evaluation of the religious content of a religious organization is fraught with the sort of entanglement that the Constitution forbids." 403 U.S. at 620, 91 S.Ct. at 2114–15.

Unlike the programs in *Lemon,* this regulatory scheme does not call upon the state to

identify certain expenses as religious or secular. It does, however, permit it to intrude upon decisions of religious authorities as to how much money should be expended and how funds should best be allotted to serve the religious goals of the schools. Either form of involvement strikes us as "a relationship pregnant with dangers of excessive government direction of church schools and hence of churches." *Id.*

Given our conclusion that the Secretary's demands for the financial data of these schools both burden the free exercise of religion and pose a threat of entanglement between the affairs of church and state, the Commonwealth must show that "some compelling state interest" justifies that burden. *Sherbert v. Verner, supra,* 374 U.S. at 406, 83 S.Ct. 1790; *see Wisconsin v. Yoder, supra,* 406 U.S. at 220–21, 92 S.Ct. 1526 (1972), and that there exists no less restrictive or entangling alternative. *See Sherbert v. Verner, supra,* 374 U.S. at 407, 83 S.Ct. 1790; *Walz v. Tax Commission, supra,* 397 U.S. at 674–75, 90 S.Ct. 1409; L. Tribe, *American Constitutional Law* 851–55 (1978). This demanding level of scrutiny also is required here because of the vehicle of regulation chosen by the Department—compelled disclosure which implicates First Amendment rights. *See generally Watkins v. United States,* 354 U.S. 178, 197–200, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957); *O'Brien v. DiGrazia,* 544 F.2d 543, 546 (1st Cir. 1976).

In *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1974), the Supreme Court considered a variety of constitutional challenges to the Federal Election Campaign Act of 1971, as amended in 1974. Ruling on an overbreadth challenge to the Act's requirement that every political committee and candidate file detailed financial reports concerning the source and amount of contributions they had received, the Court emphasized that it has "repeatedly found that compelled disclosure, in itself, can seriously impinge upon privacy of association and belief guaranteed by the First Amendment", 424 U.S. at 64, 96 S.Ct. at 656, and described the government's burden in justifying the disclosure as follows:

"We long have recognized that significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest. Since *NAACP v. Alabama* [357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)] we have required that the subordinating interests of the State must survive exacting scrutiny. We also have insisted that there be a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed . . . . This type of scrutiny is necessary even if any deterrent effect on the exercise of First Amendment rights arises, not through direct government action, but indirectly as an unintended but inevitable result of the government's conduct in requiring disclosure. . . ." *Id.* at 64–65, 96 S.Ct. at 656 (citations omitted).

While the *Buckley* Court concluded that the vital governmental interest in the "free functioning of our national institutions" outweighed the possibility of infringement of First Amendment freedoms, *id.* at 66–67, 96 S.Ct. at 657, we find that the interests served by the compelled disclosure in this case are far less weighty.[6]

The Department seeks the information in question so that it may launch an investigation of the "inflationary spiral . . . reflected in the costs of private education in the Commonwealth". With this general purpose we need have no quarrel. However, it has made no effort in this appeal to argue that its interests in refusing to exclude these schools from that investigation are of sufficient magnitude to justify an infringement of their First Amendment

---

6. We rely on *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1974), for the broad proposition that compelled disclosure implicating First Amendment freedoms must survive an exacting level of judicial scrutiny. We do not mean to imply that the First Amendment freedoms at issue in *Buckley* and in the instant case are identical. Whereas the First Amendment interest recognized in *Buckley* was freedom of association, we rest our decision here solely on the free exercise clause.

freedoms. *See Sherbert v. Verner, supra,* 374 U.S. at 406–09, 83 S.Ct. 1790; *Braunfeld v. Brown, supra,* 403 U.S. at 608–09, 81 S.Ct. 1144; Tribe, *supra,* at 855. Relying merely on the "legitimacy" and secular nature of its general objectives, the Department does not claim that it would be unable to fulfill its wide ranging duties if one portion of one segment of the economy were to be excluded from its investigation and subsequent regulation, and we cannot so assume. It does not even claim, nor could it, in our opinion, that the general interests which the Department serves rise to the level of those which have been found to outweigh First Amendment religious freedoms. *See, e. g., Gillette v. United States,* 401 U.S. 437, 462, 91 S.Ct. 828, 842–43, 28 L.Ed.2d 168 (1971) ("procuring the manpower necessary for military purposes pursuant to the . . . grant of Congress to raise and support armies" justifies denial of conscientious objector status when objection is to "unjust wars"); *Prince v. Massachusetts,* 321 U.S. 158, 168–69, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (state's interest in protecting children from physical harm and exploitation as street proselytizers overrides religious dictates); *Jehovah's Witnesses v. King County Hospital,* 390 U.S. 598, 88 S.Ct. 1260, 20 L.Ed.2d 158 (1968) (per curiam), *aff'g,* 278 F.Supp. 488 (W.D.Wash.1967) (three judge court) (state may override religiously motivated decision of parents to withhold blood transfusion necessary to save child's life). This is not a case in which the records of a religious organization are subpoenaed pursuant to a criminal investigation, a situation in which the state's interest unquestionably is strong. *In re Rabbinical Seminary,* 450 F.Supp. 1078 (E.D.N.Y.1978); *see Cantwell v. Connecticut,* 310 U.S. 296, 306, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Securities & Exchange Commission v. World Radio Mission, Inc.,* 544 F.2d 535 (1st Cir. 1976).

Finally, the Department has failed to show that it has pursued its secular objectives in the manner which is least intrusive upon religious concerns. *Walz v. Tax Commission, supra,* 397 U.S. at 674, 90 S.Ct. 1409. The Department has not satisfied that burden merely by noting that the investigation does not single out religious private schools. It is well established that state action, although neutral on its face, can in practice occasion a substantial infringement on First Amendment freedoms. *See Wisconsin v. Yoder, supra,* 406 U.S. at 220–21, 92 S.Ct. 1526; *Walz v. Tax Commission, supra,* 397 U.S. at 675–76, 90 S.Ct. 1409; *Sherbert v. Verner, supra,* 374 U.S. at 409, 83 S.Ct. 1790.

Accordingly, the judgment below is reversed. Appellants seek injunctive relief which would forbid appellee "from interfering, meddling or entangling with the financial affairs of the Roman Catholic Church." Relief of such breadth is unjustified in the context of the dispute before us. The case is remanded so that the district court may enter an order declaring unconstitutional the challenged orders of the Department compelling production of documents and information from plaintiffs-appellants and permanently enjoining the Department from enforcing such orders.

*So ordered.*