# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Enforcement of the Investigative Subpoena of:<br><br>THE COMPLEX LITIGATION DIVISION OF THE WASHINGTON STATE OFFICE OF THE ATTORNEY GENERAL.<br><br><br>STATE OF WASHINGTON,<br><br>      Appellant,<br><br>  v.<br><br>CORPORATION OF THE CATHOLIC ARCHBISHOP OF SEATTLE,<br><br>      Respondent. | No. 87005-0-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

BIRK, J. — We are asked whether the Washington Attorney General's Office (AGO) has statutory authority to subpoena records from a religious corporation concerning sexual abuse. We hold that it does.

Washington's charitable trust act (CTA), chapter 11.110 RCW, applies in relevant part to "[a]ny person holding assets subject to limitations permitting their use only for charitable, religious, eleemosynary, benevolent, educational, or similar purposes." RCW 11.110.020(2)(a)(iii). The CTA defines a person holding charitable property as a "trustee" who is subject to certain regulatory provisions. Id. One of the CTA's provisions permits the AGO to "investigate transactions and

relationships of trustees and other persons" for the purpose of "determining whether the trust or other relationship is administered according to law and the terms and purposes of the trust, or to determine compliance with this chapter in any other respect." RCW 11.110.100. The CTA excludes from the definition of "trustee" any "[r]eligious corporations duly organized and operated in good faith as religious corporations, which have received a declaration of current tax exempt status from the government of the United States," as well as certain affiliated organizations. RCW 11.110.020(2)(b)(ii).

The AGO relied on its investigative authority under RCW 11.110.100 to subpoena the Corporation of the Catholic Archbishop of Seattle, the civilly incorporated organization of the Archdiocese of the Roman Catholic Church in Western Washington (Archdiocese). The AGO's subpoena sought several categories of documents, but in summary the requests centered on "records regarding . . . clerics . . . who have been accused or suspected of sexual abuse or sexual misconduct occurring on or after January 1, 1940." The Archdiocese successfully quashed the subpoena in superior court, arguing that it is exempted from the definition of "trustee" under RCW 11.110.020(2)(b)(ii) and is therefore not subject to the AGO's investigative authority under RCW 11.110.100.

We hold that under the Washington constitution's article I, section 12 privileges and immunities clause, the exemption for religious corporations may be applied here only more narrowly to exempt religious corporations to the extent required to protect their rights under the federal and state constitutional religion

2

clauses.  This means the AGO's subpoena is supported by statutory authorization, and we therefore reverse and remand for further proceedings.

I

The Archdiocese is civilly incorporated as a corporation sole under Washington's corporations sole act, chapter 24.12 RCW.[1]  Under RCW 24.12.030, property held in the official capacity of the bishop or other person presiding over a corporation sole "shall be held in trust for the use, purpose, benefit, and behoof of his or her religious denomination, society or church."  Since its first recognition by the Washington Territorial Legislature in 1861, today's Archdiocese has gone through a series of amendments to its articles of incorporation.  LAWS OF 1860, at 129.  Article VI of the Archdiocese's 1951 amended articles of incorporation states it is "not organized for profit or gain, . . . all property held by it being in trust for the use, purpose, benefit and behoof of the Roman Catholic Church of the Archdiocese of Seattle . . . in the State of Washington."

The AGO served its subpoena on the Archdiocese in July 2023.  According to the AGO's letter accompanying its subpoena, it invoked RCW 11.110.100 to "determine 'whether the trust or other relationship is administered according to law and the terms and purposes of the trust.' "  The AGO said it "initiat[ed] this investigation to determine how the Catholic Church in Washington has handled

---

[1] See RCW 24.12.010 ("Any person, being the bishop . . . of any church or religious denomination in this state, may . . . become a corporation sole . . . and, thereupon, said bishop . . . shall be held and deemed to be a body corporate, with all the rights and powers prescribed in the case of corporations aggregate"); see also BLACK'S LAW DICTIONARY 433 (12th ed. 2024) (defining "corporation sole" as "a corporation having or acting through only a single member").

allegations of child sexual abuse, and whether recent reforms publicized by the Church are being implemented and whether they are effective."  The AGO said that "similar investigations around the country have revealed that the Church has repeatedly failed to protect children and has misled the public by hiding the truth about the extent of sexual abuse within its ranks."[2]  The AGO said its "aim in this investigation is to share a full accounting of sexual abuse committed by Catholic clergy and other agents; ensure that appropriate reforms have been made and are effective in preventing abuse; and honor survivors by giving voice to their experiences and dignifying their journey towards recovery."

The AGO's initial July 2023 subpoena made 23 document requests. Besides the request noted above for records regarding clerics accused or suspected of abuse, the subpoena sought, for instance, documents provided to certain third parties, such as treatment providers, "law enforcement on or after January 1, 1940," or documents "reflecting communications with the public about allegations of sexual abuse."  It sought "[a]ll documents relating to the restriction of duties, reassignment, removal from the ministry," and other "discipline" of individuals accused of sexual misconduct.  It sought "[a]ll documents and policies relating to compensation to, or monetary or non-monetary, formal or informal settlements with private individuals arising from allegations of sexual abuse or

---

[2] In this court and in the trial court, both parties have relied on sources attributed to websites reportedly documenting, on the one hand, abuse by Catholic clerics together with state investigations of the same, and, on the other hand, the Catholic Church's responses to such abuse.  We accept the parties' respective representations of these sources, from each side without objection by the other, but we have not independently examined the unauthenticated websites never made part of the superior court record.

sexual misconduct by clergy members." The AGO supplemented its subpoena in April 2024. The supplemental subpoena added five new requests seeking "governing documents," "[a]ll documents . . . pertaining to any trust," and financial records "describing liabilities," "describing disbursements," or any other "accounting records."

The Archdiocese produced some documents but otherwise objected to the subpoena, and the AGO petitioned to enforce the subpoena in superior court. The AGO's petition described its investigation as addressing "allegations that the Catholic Church has facilitated and attempted to cover up decades of pervasive sexual abuse of children by Church leaders in Washington State" by "misus[ing] its religious and charitable trust funds." The petition emphasized the example of a priest who joined the church in 1958 and perpetrated decades of abuse. According to the AGO's petition, the Archdiocese knew of this priest's abuse but "repeatedly transferr[ed] him to new parishes," allowed him to "remain[] an incardinated priest," and provided him a "monthly stipend." The Archdiocese responded that the priest's "reprehensible crimes against children, and any neglect on the part of the Archdiocese, his former employer, has received a full airing without the AGO's involvement and with the standard use of civil process."

The court ruled the CTA's exemption of religious corporations from the definition of trustee was enforceable as a categorical exemption and denied enforcement of the subpoena. The AGO appeals.[3]

---

[3] This court received *amicus curiae* briefs from three parties: Heal Our Church, Suzanne Healy, and six First Amendment scholars from various law schools. To the extent *amici* present new arguments not presented by the parties,

5

II

The interpretation of a statute is a question of law that we review de novo. Dep't of Lab. & Indus. v. Cannabis Green, LLC, 4 Wn.3d 829, 840, 569 P.3d 303 (2025). Our goal is to determine the legislature's intent. Id. We determine legislative intent from the "plain language enacted by the legislature, considering the text of the provision in question, the context of the statute in which the provision is found, related provisions, amendments to the provision, and the statutory scheme as a whole." Ass'n of Wash. Spirits & Wine Distribs. v. Liquor Control Bd., 182 Wn.2d 342, 350, 340 P.3d 849 (2015) (citing Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002)). Likewise, we review the constitutionality of a statute de novo. Vet Voice Found. v. Hobbs, 4 Wn.3d 383, 398, 564 P.3d 978 (2025). Statutes are presumed constitutional, and in most cases the challenger bears the burden of establishing otherwise. Id.

A

The AGO first argues that the religious corporations exemption by its terms does not bar its investigation into sexual abuse. The exemption covers "[r]eligious corporations duly organized and operated in good faith as religious organizations." RCW 11.110.020(2)(b)(ii). The AGO reasons that because the exemption requires the religious corporations be "operated in good faith," id., a religious corporation cannot come within the exemption to the extent it is involved "in secular, bad-faith misconduct like sexual abuse." From this, the AGO concludes "the use of

we exercise our discretion to decline to consider them. See Keodalah v. Allstate Ins. Co., 194 Wn.2d 339, 346 n.4, 449 P.3d 1040 (2019).

6

charitable trust funds to conceal and facilitate sexual abuse" is "bad-faith misconduct" outside the exemption.

However, the text of RCW 11.110.020(2)(b)(ii) defeats an activity-by-activity analysis of the exemption. The whole phrase ends in language focusing the analysis on the organization as a whole—covering "[r]eligious corporations duly organized and operated in good faith *as religious organizations*." RCW 11.110.020(2)(b)(ii) (emphasis added). To ask whether a corporation is operated in good faith "as" a particular kind of organization focuses the inquiry on whether the organization is truly of that kind, here a religious one, rather than on whether individual acts, through individual agents, are individually done in good faith.[4]

Other aspects of the CTA besides the AGO's investigative authority suggest the desirability of an organizational-level determination of the exemption, specifically the requirement that certain trustees register with the secretary of state.[5] RCW 11.110.051. The AGO convincingly argues that acts of involvement in sexual abuse can never be done in good faith. But in asking whether a religious corporation is "operated in good faith as [a] religious organization[]," the statute

___

[4] Since the phrase "operated in good faith" is immediately followed by "as religious organizations," it is clear that these two phrases at minimum go together. RCW 11.110.020(2)(b)(ii). It is likely that the earlier phrase, "duly organized" also refers to "duly organized . . . as religious organizations," though with the "duly organized" prong not challenged, we need not address it. Id.

[5] The CTA's religious corporations exemption also requires that the religious corporation "have received a declaration of current tax exempt status from the government of the United States." RCW 11.110.020(2)(b)(ii). The Archdiocese provided a letter from the Internal Revenue Service confirming it is "exempt from federal income tax under section [26 U.S.C. §] 501(c)(3) of the Internal Revenue Code." The AGO has not challenged the Archdiocese's assertion that it meets this element of the exemption.

asks about good faith in the corporation's being a religious one, a different question. RCW 11.110.020(2)(b)(ii). When this question is asked of the Archdiocese, the longstanding establishment in Western Washington of one of the world's most ancient and most cultivated religions, it clearly qualifies.

B

The AGO argues that the applicability of the exemption is nevertheless limited by the privileges and immunities clause of article I, section 12 of the Washington constitution. The AGO argues that under article I, section 12, the CTA's statutory carveout for religious organizations grants a privilege, in this case implicating a fundamental right, that is not justified by reasonable grounds. The AGO argues, "[T]here are no reasonable grounds to distinguish between religious and secular institutions for purposes of authorizing an investigation into using charitable funds to facilitate sexual abuse." To the extent of our discussion below, we agree with the AGO.

1

Washington's privileges and immunities clause states, "No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations." CONST. art. I, § 12. Although article I, section 12 operates similarly to the federal equal protection clause, U.S. CONST. amend. XIV, § 1, in Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake, 145 Wn.2d 702, 726, 42 P.3d 394 (2002) (Grant County I), vacated in part on reh'g, 150 Wn.2d 791, 83 P.3d 419 (2004) (Grant County II), the court explained it serves

a further purpose: "whereas the federal constitution is concerned with majoritarian threats of invidious discrimination, the state constitution protects against laws serving private interests to the detriment of the majority."[6] Thus, independent state constitutional analysis is appropriate in cases involving favoritism. Grant County II, 150 Wn.2d at 808-09 & n.12. This state constitutional principle protects against laws serving the interest of special classes of citizens to the detriment of the interests of all citizens. Madison v. State, 161 Wn.2d 85, 97, 163 P.3d 757 (2007). Article I, section 12 was intended to prevent favoritism and special treatment for a few to the disadvantage of others. Martinez-Cuevas v. DeRuyter Bros. Dairy, Inc., 196 Wn.2d 506, 518, 475 P.3d 164 (2020).

Antifavoritism analysis under article I, section 12 subjects legislation to a two-part test. Schroeder v. Weighall, 179 Wn.2d 566, 572-73, 316 P.3d 482 (2014). First, the court asks whether a challenged law grants a "privilege" or "immunity" for purposes of our state constitution. Id. at 573. If the answer is yes,

---

[6] Among the Washington Supreme Court's first applications of article I, section 12, the court said, "The object of the constitution was to prohibit special legislation, and substitute in its place a general law, which bore on all alike." City of Tacoma v. Krech, 15 Wash. 296, 297, 46 P. 255 (1896), overruled by State v. Nichols, 28 Wash. 628, 69 P. 372 (1902). Krech's focus on "special legislation" anticipated the Supreme Court's jurisprudence on article I, section 12 today. In the same era, the court also applied the provision to legislative classifications, analogously to the equal protection clause of the Fourteenth Amendment. E.g. McDaniels v. J.J. Connelly Shoe Co., 30 Wash. 549, 555, 71 P. 37 (1902). During the twentieth century, challenges to legislative classification became the mainstay of article I, section 12 litigation. As early as 1941, the court said that analysis under article I, section 12 is "substantially identical" to that under the federal Equal Protection Clause. Texas Co. v. Cohn, 8 Wn.2d 360, 374, 112 P.2d 522 (1941). By the end of the century, the near equivalence of the two provisions had been stated many times. Seeley v. State, 132 Wn.2d 776, 788, 940 P.2d 604 (1997).

9

then the court asks whether there is a "reasonable ground" for granting that privilege or immunity. Id.

a

Under the first step, article I, section 12 antifavoritism analysis is triggered only by statutory benefits implicating fundamental rights of state citizenship. Id. (quoting State v. Vance, 29 Wash. 435, 458, 70 P. 34 (1902)). Citing a treatise, Vance said that the terms privileges and immunities,

> as they are used in the constitution of the United States, secure in each state to the citizens of all states the right to remove to and carry on business therein; the right, by usual modes, to acquire and hold property, and to protect and defendant the same in the law; the rights to the usual remedies to collect debts, and to enforce other personal right[s]; and the right to be exempt, in property or persons, from taxes or burdens which the property or persons of citizens of some other state are exempt from.

29 Wash. at 458 (citing THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 597 & n.3 (Alexis Angell ed., 6th ed. 1890)).

The treatise that Vance cited relied on Corfield v. Coryell, which said that the privileges and immunities intended to be guaranteed under article IV, section 2 of the federal constitution may

> be all comprehended under the following general heads: Protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety; subject nevertheless to such restraints as the government may justly prescribe for the general good of the whole. The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to institute and maintain actions of any kind in the courts of the state; to take, hold and dispose of property, either real or personal; and an

10

exemption from higher taxes or impositions than are paid by the other citizens of the state; may be mentioned as some of the particular privileges and immunities of citizens, which are clearly embraced by the general description of privileges deemed to be fundamental: to which may be added, the elective franchise, as regulated and established by the laws or constitution of the state in which it is to be exercised.

6 F. Cas. 546, 551-52 (C.C.E.D. Pa. 1823).[7] The Washington Supreme Court has cited Vance and Corfield in defining fundamental rights. Martinez-Cuevas, 196 Wn.2d at 521-22. The court has declined to adopt an exclusive enumeration of fundamental rights. Id. at 522. In contrast, however, generally rights left to the discretion of the legislature have not been considered fundamental. Id. at 519.

b

Under the second step of article I, section 12 antifavoritism analysis, the reasonable ground test is more exacting than rational basis review. Schroeder, 179 Wn.2d at 574. Under the reasonable ground test, a court will not hypothesize facts to justify a legislative distinction. Id. Rather, the court will scrutinize the legislative distinction to determine whether it in fact serves the legislature's stated goal. Id. Article I, section 12's analysis does not allow speculation. Martinez-Cuevas, 196 Wn.2d at 523. Under article I, section 12, a provision must be justified

---

[7] Corfield was written by United States Supreme Court Justice Bushrod Washington, nephew of President George Washington, while riding circuit. ERIC FONER, THE SECOND FOUNDING, HOW THE CIVIL WAR AND RECONSTRUCTION REMADE THE CONSTITUTION 73-74 (2019). This was the "prewar effort" to interpret the original Constitution's mention of privileges and immunities that was "most widely cited during Reconstruction"—the time when it became important to understand the privileges and immunities clause of the Fourteenth Amendment. Id. at 73. Corfield thus gained currency during the era leading up to the time when the Washington constitution was formed. Martinez-Cuevas describes the widely-criticized subsequent interpretation of the privileges and immunities clause of the Fourteenth Amendment by the United States Supreme Court. Martinez-Cuevas, 196 Wn.2d at 515-19.

in fact and theory. Id. In assessing the existence of reasonable grounds, courts may rely on statutory language to ascertain legislative goals when construing statutory and constitutional provisions. Woods v. Seattle's Union Gospel Mission, 197 Wn.2d 231, 244, 481 P.3d 1060 (2021) (citing Dep't of Ecology, 146 Wn.2d at 11). Meaning is discerned from the language itself, the context and related provisions in relation to the subject of the legislation, the nature of the act, the general object to be accomplished, and the *consequences* that would result from construing a statute in a particular way. Id. at 244-45 (citing Burns v. City of Seattle, 161 Wn.2d 129, 146, 164 P.3d 475 (2007)).

2

The AGO argues that this case is controlled by the analysis in Woods. In Woods, the court examined an as applied challenge under article I, section 12 to another statutory exemption for religious organizations, and relied on the First Amendment to set "the appropriate parameters of the provision's application." Id. at 241, 246. Woods brought an employment discrimination action against Seattle's Union Gospel Mission. Id. at 236. The Mission was "a nonprofit, evangelical Christian organization providing services to Seattle's unsheltered homeless population." Id. at 237. The Mission declined to hire Woods because he was in a same-sex relationship. Id. The Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, guarantees "[t]he right to be free from discrimination because of . . . sexual orientation," which includes "[t]he right to obtain and hold employment without discrimination." RCW 49.60.030(1)(a). In Woods, the Mission argued that it was exempt from the WLAD because, in defining "employer," the WLAD exempts

"any religious or sectarian organization not organized for private profit." 197 Wn.2d at 236-37; RCW 49.60.040(11). Woods argued that as applied specifically to his case, the WLAD's granting an exemption to religious employers violated article I, section 12. Id. at 241.

As applied to Woods, the religious employer exemption from the WLAD burdened two fundamental rights—the right to an individual's sexual orientation and the right to marry. Id. at 242 (citing Lawrence v. Texas, 539 U.S. 558, 577-78, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003); Obergefell v. Hodges, 576 U.S. 644, 663-65, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015)). But, turning to reasonable grounds, the court held that reasonable grounds existed to distinguish religious and secular nonprofits to secure the "avoidance of state interference with religion." Id. at 246 (citing Ockletree v. Franciscan Health Sys., 179 Wn.2d 769, 806, 317 P.3d 1009 (2014) (Wiggins, J., concurring in part in dissent) ("[I]t was reasonable for the legislature to exempt religious nonprofit organizations from the definition of 'employer' in order to promote two goals: avoiding excessive entanglement with religious doctrines and practices and facilitating the free exercise of religion guaranteed by our Washington Constitution.")). However, while this conclusion preserved the WLAD religious employer exemption against a facial challenge, the court next turned to the possibility that the exemption "may still be unconstitutional as-applied to Woods." Id.

Having concluded that reasonable grounds existed justifying the legislature in treating religious organizations differently "in order to avoid state interference with religious freedoms," id. at 245-46 (citing Ockletree, 179 Wn.2d at 784 (plurality

13

opinion)), the court turned to the First Amendment to set "the appropriate parameters of the provision's application." Id. at 246. Woods concluded that article I, section 12 "is not offended" if the WLAD exemption for religious organizations is applied concerning claims subject to the First Amendment "ministerial exception."[8] 197 Wn.2d at 250.

Woods held that that the ministerial exception provided "a fair and useful approach for determining whether application of RCW 49.60.040(11) unconstitutionally infringes on Woods' fundamental right to his sexual orientation and right to marry." 197 Wn.2d at 251. With Woods's fundamental rights burdened by the religious employer exemption, the Supreme Court allowed the exemption to apply coextensively with the reasonable grounds the court identified, avoiding state interference with religious freedoms. This meant in turn that the exemption applied coextensively with, and its availability would be determined by, the scope of the Mission's implicated religious freedoms, in that case the ministerial exception.

---

[8] Under the ministerial exception, "to preserve a church's independent authority" on matters of faith and doctrine, courts must abstain from adjudicating "employment disputes involving those holding certain important positions with churches and other religious institutions." Our Lady of Guadalupe Sch. v. Morrissey-Berru, 591 U.S. 732, 746-47, 140 S. Ct. 2049, 207 L. Ed. 2d 870 (2020); see also Hosanna-Tabor Evangelical Lutheran Church & Sch. v. Equal Emp't Opportunity Comm'n, 565 U.S. 171, 188, 132 S. Ct. 694, 181 L. Ed. 2d 650 (2012) ("Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs.").

3

a

Applying the above principles to the present case, the parties dispute whether the CTA's religious corporations exemption implicates a fundamental right under article I, section 12. We hold that there is, as a fundamental right of Washington state citizenship, a right to be free from unwanted interference with one's own body, which includes the right to be free from sexual abuse.

Cited with approval by the Washington Supreme Court, Corfield lists the following among fundamental rights: protection by the government and the enjoyment of life and liberty, and the right to pursue and obtain happiness and safety. 6 F. Cas. at 551-52. Legal protection against assault is one of the oldest, and one of the most basic, continually recognized aims of the law, with the common law recognizing the right to be free from bodily invasion and from nonconsensual invasions of one's bodily integrity. In re Welfare of Colyer, 99 Wn.2d 114, 121-22, 660 P.2d 738 (1983). A fundamental interest in autonomous decision-making is recognized involving "issues related to marriage, procreation, family relationships, child rearing and education." O'Hartigan v. Dep't of Pers., 118 Wn.2d 111, 117, 821 P.2d 44 (1991). Washington courts recognize "a child's fundamental right to health and safety" in the context of parental termination proceedings.[9] In re

---

[9] Other principles of Washington law reinforce a fundamental right to be free from unwanted interference with one's person. Article I, section 7 of Washington's constitution states that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." The "primary purpose" of article I, section 7 "is to protect the individual right to privacy." State v. Mayfield, 192 Wn.2d 871, 882, 434 P.3d 58 (2019). Article 1, section 7 guarantees, for instance, a right to refuse medical treatment. Colyer, 99 Wn.2d at 120. In furtherance of the

Dependency of M.H.P., 184 Wn.2d 741, 758 n.7, 364 P.3d 94 (2015). Washington law uniformly supports a right to be free from unwanted interference with one's own body, including the right to be free from sexual abuse, as a fundamental right of state citizenship. This right is among the rights protected as privileges and immunities under article I, section 12.

The Archdiocese does not directly dispute that a right to be free from sexual abuse exists, but argues that exempting it from the AGO's subpoena power under the CTA does not burden the identified right in the same way that challenged exemptions did in other cases. In Woods, exempting the Mission from the WLAD would have permitted it to discriminate against Woods, undermining his fundamental rights to his sexual orientation and to marry. In Martinez-Ceuvas, the Washington Minimum Wage Act, ch. 49.46 RCW, was a statutory implementation of the fundamental right of Washington workers to health and safety in the workplace. 196 Wn.2d at 520-21. Although the Minimum Wage Act protected farmworkers to an extent, id. at 521, the exemption for agricultural workers from overtime pay requirements directly deprived them of guaranteed health and safety. Id. at 520 ("Overtime work is particularly injurious, resulting in increased injuries, illness, and mortality."). And in Schroeder, the elimination of tolling for minors'

---

constitutional guarantee of privacy, the legislature and the Supreme Court have recognized a fundamental right of privacy with respect to personal reproductive decisions. RCW 9.02.100; Pacheco v. United States, 200 Wn.2d 171, 180, 515 P.3d 510 (2022). Under the state constitution's due process clause, article I, section 3, this court has recognized a protected person's rights as including a "liberty interest in their personal security and bodily integrity." Wash. Fed'n of State Emps., Council, 28 v. State, 22 Wn. App. 2d 392, 405, 511 P.3d 119 (2022), aff'd in part, rev'd in part, 2 Wn.3d 1, 534 P.3d 320 (2023).

claims for medical negligence directly impaired the minor's fundamental right to pursue common law causes of action in court. 179 Wn.2d at 573-74. The Archdiocese says this case does not involve a similar direct impact on the fundamental right to be free from unwanted bodily interference, because exempting it from the AGO's statutory subpoena power does not directly condone the invasion of any person's bodily autonomy.

If we were faced with a facial challenge to the religious corporations exemption, we would likely agree with the Archdiocese. But the Supreme Court expressly allows as applied challenges under article I, section 12. Woods, 197 Wn.2d at 246; Grant County II, 150 Wn.2d at 812 ("For a violation of article I, section 12 to occur, the law, or its application, must confer a privilege to a class of citizens."). The AGO makes an as applied challenge to the operation of the exemption, and expressly does not make a facial challenge. Although the scope of the AGO's subpoena is broad—and we address its scope below—its focus is on sexual abuse that burdened survivors' fundamental right to be free from unwanted interference with their bodies. As the Archdiocese recognizes, one purpose of the CTA was to facilitate enforcement of the purposes of charitable trusts because, before such laws, trustees had no duty to furnish trust information to the AGO. William H. Wicker, Charitable Trusts, 11 Gonz. L. Rev. 1, 12 (1975). In this as applied challenge, we focus on the particular facts involving a long history, publicly acknowledged, of abuse that was criminal, tortious, or both, together with a statutory provision exempting religious corporations, but not secular trusts, from disclosing evidence to a public agency vested with oversight authority. To the

17

extent the AGO's subpoena seeks evidence relevant to the existence of conduct that was criminal, tortious, or both, the exemption from disclosure burdens the rights of the survivors of such conduct.

b

When <u>Woods</u> turned to the second step of article I, section 12 antifavoritism analysis, it held that federal and state constitutional religious protections and their requirement of avoidance of state interference with religion justified the legislature in treating religious and secular nonprofits differently. 197 Wn.2d at 245-46. "Among other things," the religion clauses of the First Amendment "protect the right of churches and other religious institutions to decide matters 'of faith and doctrine' without government intrusion." <u>Our Lady of Guadalupe Sch. v. Morrissey-Berru</u>, 591 U.S. 732, 746, 140 S. Ct. 2049, 207 L. Ed. 2d 870 (2020) (internal quotation marks omitted) (quoting <u>Hosanna-Tabor Evangelical Lutheran Church & Sch. v. Equal Emp't Opportunity Comm'n</u>, 565 U.S. 171, 186, 132 S. Ct. 694, 181 L. Ed. 2d 650 (2012)). Closely linked, the First Amendment religion clauses guarantee the independence of religious institutions in matters of church government. <u>Id.</u> "This does not mean that religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission." <u>Id.</u> This autonomy includes, under the ministerial exception, "the selection of the

individuals who play certain key roles." <u>Id.</u> And article I, section 11 of the Washington constitution states,

> Absolute freedom of conscience in all matters of religious sentiment, belief, and worship, shall be guaranteed to every individual, and no one shall be molested or disturbed in person or property on account of religion; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace and safety of the state.

The Washington Supreme Court has held that this language is "stronger" than that of the First Amendment, and, compared to the federal constitution, has a broader scope, protecting "both belief and conduct," as evidenced in the terms "worship," "acts," and "practices." <u>First Covenant Church of Seattle v. City of Seattle</u>, 120 Wn.2d 203, 224, 840 P.2d 174 (1992). A civil court's involvement in religious matters can constitute excessive entanglement between church and state and have the effect of inhibiting religion, in violation of the First Amendment. <u>Erdman v. Chapel Hill Presbyterian Church</u>, 175 Wn.2d 659, 670, 286 P.3d 357 (2012).

The Archdiocese offers direct evidence that the religious corporations exemption was included because its proponents had these concerns in mind. In a February 3, 1966 memorandum, an AGO officer wrote in regard to then-proposed charitable trust legislation that "[t]he exemption of bona fide religious organizations was felt desirable because there are serious questions as to the issues of separation of church and state which could be involved if it were handled otherwise." There is a difference between a nonreligious charitable trust and a religious corporation having constitutionally guaranteed protections from governmental interference with faith and doctrine, church government, selection of

key personnel, and religious belief and conduct. Again, if the AGO were making a facial challenge, we would probably conclude that reasonable grounds existed to treat a religious corporation differently. But with the AGO making only an as applied challenge, Woods teaches that the existence of reasonable grounds to treat a religious corporation differently does not answer the question whether reasonable grounds exist to support a "constitutional application" of the exemption in this case.

We are satisfied that if the AGO, with the court's authorization, achieved the maximal exercise of its powers under the CTA as if there were not any exemption for religious corporations, it would unconstitutionally encroach upon the Archdiocese's protected freedoms. The CTA authorizes the AGO to investigate transactions and relationships of trustees and other persons, among other purposes, "for the purpose of determining whether the trust . . . is administered according to . . . the terms and purposes of the trust." RCW 11.110.100. The operative trust document in this case specifies those purposes as being "for the use, purpose, benefit and behoof of the Roman Catholic Church of the Archdiocese of Seattle . . . in the State of Washington."

As the Archdiocese correctly observes, a civil authority in the United States cannot sit in judgment of whether the Archdiocese has conformed to its faith and doctrine. To the extent, by its subpoena or otherwise, the AGO were to purport to second-guess whether a given action by the Archdiocese was truly "for the use, purpose, benefit and behoof" of the church, the AGO and its use of the subpoena would violate the federal and state constitutional religious protections. See

Hosanna-Tabor, 565 U.S. at 187 ("[B]y inquiring into whether the Church had followed its own procedures," a court "had 'unconstitutionally undertaken the resolution of quintessentially religious controversies whose resolution the First Amendment commits exclusively to the highest ecclesiastical tribunals' of the Church.") (quoting Serbian E. Orthodox Diocese for U.S. of Am. and Canada v. Milivojevich, 426 U.S. 696, 720, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976)).  The United States Supreme Court has acknowledged the possibility that when a governmental inquiry "will necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators" and a religious organization's "relationship" to its "religious mission," "the very process of inquiry" may "impinge on rights guaranteed by the Religion Clauses."  Nat'l Lab. Rels. Bd. v. Catholic Bishop of Chicago, 440 U.S. 490, 502, 99 S. Ct. 1313, 59 L. Ed. 2d 533 (1979).

At the same time, the subpoena to this point does not implicate a civil authority second-guessing the Archdiocese's decision-making or good faith, but requires only the production of documents.  Besides compliance with the terms of a trust, the CTA also empowers the AGO to investigate transactions and relationships of trustees and other persons "for the purpose of determining whether the trust . . . is administered according to law."  RCW 11.110.100.  The Archdiocese has not pointed to any authority that constitutional religious protections are offended by inquiry into whether criminal or tortious conduct has occurred, including sexual abuse by clergy.

If "prohibiting the exercise of religion . . . is not the object of the [law] but merely the incidental effect of a generally applicable and otherwise valid provision,

the First Amendment has not been offended." Emp't Div., Dep't of Hum. Res. v. Smith, 494 U.S. 872, 877-78, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990). Likewise, constitutional religious protections do "not provide churches with absolute immunity to engage in tortious conduct" "[s]o long as liability is predicated on secular conduct and does not involve the interpretation of church doctrine or religious beliefs." C.J.C. v. Corp. of Catholic Bishop, 138 Wn.2d 699, 728, 985 P.2d 262 (1999) ("[T]he constitutional guarantee of *religious* freedom cannot be construed to protect *secular* beliefs and behavior, even when they comprise part of an otherwise religious relationship between a minister and a member of his or her congregation.") (citing Sanders v. Casa View Baptist Church, 134 F.3d 331, 336 (5th Cir. 1998)); see also N.K. v. Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints, 175 Wn. App. 517, 543-44, 307 P.3d 730 (2013) ("To the extent the church may be arguing that nonprivileged information in the disciplinary files is shielded by the First Amendment, we disagree.").

Citing Surinach v. Pesquera De Busquets, 604 F.2d 73, 75-76 (1st Cir. 1979), the Archdiocese argues that "where document production is related to an investigation pursuant to a statutory scheme that would infringe church autonomy, the First Amendment is violated." In Surinach, Puerto Rico law authorized its Department of Consumer Affairs to restrain inflationary trends and establish price controls. Id. at 73-74. Investigating the costs of private schools, including Roman Catholic parochial schools, the Department ordered the parochial schools to produce records detailing the schools' budgets, revenues, and operating costs. Id. at 74. Recognizing the schools' Canon Law mandate to pursue academic

excellence, the court concluded "the eventual use to which the school's cost information could be put could interfere seriously with these religious duties and objectives." Id. at 77. In the regulatory process, it was likely "some determination of which costs are 'necessary' and 'reasonable' in the running of a private school would have to be made." Id. Thus, the court saw the likelihood of civil authorities furthering a secular objective at the expense of a religious one, a chilling effect resulting from public disclosure of the schools' decision-making process and donors, and entanglement in the schools' fiscal management. Id. at 78. Thus, the demands burdened the schools' free exercise of religion and posed a threat of entanglement between the affairs of church and state, placing the burden on the government to show some compelling state interest justified that burden. Id. at 79.

The present case is distinguished, however, by a clear history, the existence of which is not disputed even while its details may be, of acts by Archdiocese personnel that were either criminal, tortious, or both. Although the AGO's investigatory power under RCW 11.110.100 may be a precursor to enforcement action under RCW 11.110.120 or other statutory authority, under the CTA, discovery of unlawful acts is an authorized end in and of itself. The authority to take enforcement action where a charitable trust has engaged in an act violating criminal or civil law logically includes the authority to discover that such an act has occurred, regardless of whether enforcement is pursued. Unlike the Puerto Rico law at issue in Surinach, the discovery of evidence of an act that was criminal, tortious, or both, is "an end in itself" under the CTA. Id. at 75.

A conclusion that a state may constitutionally investigate the existence and scope of sexual abuse by clergy is reinforced by the parties' acknowledgement that a number of states have done so. The AGO points to civil investigations completed by other states with a comprehensive scope, such as one by Maryland and another by Illinois, with which the church cooperated, revealing "quadruple the number of credibly accused abusers than the Church had voluntarily disclosed prior to the investigation." We recognize that the Archdiocese argues that the investigation itself violates the First Amendment, but it cites no authority that other states' investigations into the existence and scope of sexual abuse by clergy violated constitutional religious protections from governmental interference with faith and doctrine, church government, selection of key personnel, or religious belief and conduct. Rather, to distinguish those investigations, the Archdiocese argues that Washington law imposes a more circumscribed role to our AGO. The AGO's state law authority is a question of state law, controlled by the CTA as it must be construed under Article I, section 12. To the extent statutory authorization supports the AGO's subpoena, the Archdiocese has provided no authority why the First Amendment would not permit Washington's investigation to reach as far as Maryland's or Illinois's.

We perceive in the AGO's subpoena a scope that, if pursued, would clearly unconstitutionally infringe the Archdiocese's religious protections, to the extent the AGO seeks to determine whether any given act or expenditure by the Archdiocese was "for the use, purpose, benefit and behoof" of the church. But we also perceive a scope that clearly does not infringe the Archdiocese's religious protections, to

the extent the AGO seeks evidence relevant to determining that an act occurred that is criminal, tortious, or both, including sexual abuse by clergy. As in Woods, the Archdiocese's protections under the federal and state constitutional religion clauses provide the appropriate approach for determining whether application of the religious corporations exemption infringes on the fundamental rights of survivors of criminal and tortious acts, including sexual abuse by clergy, and this is the limit to which the CTA's religious corporations exemption is supported by reasonable grounds. We hold that RCW 11.110.020(2)(b)(ii) exempts religious corporations from the AGO's investigative authority under RCW 11.110.100 to the extent the AGO's exercise of that authority would intrude upon rights protected by the federal and state constitutional religion clauses.[10] However, to the extent the AGO's exercise of its authority would not intrude upon these protected rights, the exemption cannot be applied and the AGO's subpoena was authorized by RCW 11.110.100. As a result, we must reverse.

III

Because the superior court held that RCW 11.110.020(2)(b)(ii) categorically exempted the Archdiocese from the AGO's subpoena, it never reached the AGO's individual document requests. On remand, the superior court must address the scope of the AGO's subpoena that is allowable without infringing the Archdiocese's

---

[10] Neither party asserts that any other requirements under the CTA, such as requiring trustees to register with the secretary of state under RCW 11.110.051, implicate a fundamental right. Accordingly, in the absence of the necessary analysis under article I, section 12, our opinion does not run to any provision of the CTA other than RCW 11.110.020(2)(b)(ii) as applied in this case, and we do not subject religious corporations to the requirements of the CTA generally.

rights under the federal and state constitutional religion clauses. The subpoena cannot be enforced to the extent the AGO purports to determine whether any given act or expenditure by the Archdiocese was "for the use, purpose, benefit and behoof" of the church. But the subpoena may and should be enforced to the extent the AGO seeks evidence relevant to determining the existence of an act that was criminal, tortious, or both, including sexual abuse by clergy. While we define these two zones in which the subpoena is and is not enforceable, we do not determine the precise boundaries to which the subpoena may extend in between them. On remand, the superior court must determine the dividing line in the first instance, with the aid of the parties' briefing and argument.

We reverse and remand for proceedings consistent with this opinion.

Birk, J.

WE CONCUR:

, ACJ Smith, J.